Good morning. May it please the court, my name is Daniel Kaplan. I represent the appellant, Charles Soderman, and I'm going to watch the clock and try to reserve three minutes of my time for rebuttal. Can you pull that microphone a little closer, counsel, and speak right up so the A students in the back of the room can hear you? Thank you, Judge. Thank you, Judge Hawkins. What I'm holding here is a copy of Exhibit 2, Government's Exhibit 2, from the trial of Charles Soderman. Sixty-two pages of instant messaging between my client, Charles Soderman, and agents masquerading as a like-minded person named John Kowski. If anyone ever needed a manual for how to entrap someone, this exhibit would be an excellent option to use. And the reason is, as the district judge observed at the end of the trial in the sentencing, convincing Charles Soderman to commit the offense charged in this case, the offense of traveling in interstate commerce and attempted travel in foreign commerce for the purpose of engaging in illicit sexual conduct, was not an easy task. It was, in the judge's words, like pulling teeth. And to overcome Charles's resistance and his reluctance, expressed many, many times throughout the course of this 13-month course of exchanges of messages. Your burden is a little steeper than just our concluding that the jury should have concluded that he had a lack of predisposition, right? Correct. The burden is, could any reasonable jury have found that the government met its burden? But I would like to stress that part of it. The government had the burden to show that Charles was not entrapped. The government had to show, beyond a reasonable doubt, that Charles was not entrapped. That's if we accept your argument that there clearly was inducement. Correct. So in showing beyond a reasonable doubt that Charles was not entrapped, the government first would either have to show beyond a reasonable doubt that he was not induced or that he was, in fact, predisposed. So dealing with the first one of those points, as the district judge pointed out, although the district judge did not conclude there was entrapment as a matter of law, what he described accurately, I believe, was clearly inducement as a matter of law when he said that it was hard work to get to convince Charles to commit this offense, that it was like pulling teeth. And that is clearly shown primarily by this exhibit, Exhibit 2, this 13-month course of chats in which the government essentially pulled out all the stops and used every technique that I saw in the case law identified as a method of inducement, is in here many, many times over, plus one that I never even saw in any of the case law, which is the extent the government went to where the fictional character John Kowski said, I'm going to wait for you to do this before I do this. And the way he expressed that, he made it clear that he was putting off any sexual gratification until Charles went ahead and took this trip and committed this crime. And he expressed his mounting frustration as a way of pressuring Charles, saying, I can't wait much longer, I can't hold out much longer, I could blow up. And I was sitting in bed and thinking about it, and I thought I had to wait. And then there's Ugg, with many Hs following, expressing this sexual frustration that this person, Charles believed, was a friendly, like-minded person who shared his feelings, who wanted to support him, was feeling because he had to wait until Charles committed the offense. That really tops them all. That shows a creativity in inducing that's beyond what I've seen in any case. Didn't your client at the earlier stages of contact with the undercover agents express a desire to travel to Mexico? No. For these purposes? No. What he said was, of course, the first agent, Agent Stokowski, had the first exchange, which did not lead her to open a case. And what she said, we don't have it in the record because it was a race, but she had characterized it as, I said something about the trip to Mexico, and his response was something like, that sounds great, I'm not sure I could do that. So he expressed some approval of the idea or some interest in the idea in the abstract. But at the same time, from that very first exchange, he expressed his reluctance. Well, they were not talking about going to Mexico to go fishing. Oh, no, no, absolutely. Yes, I agree. He expressed his abstract interest in the act that would be at the end of that trip. And early on, didn't he ask about some of the logistics, like whether he would need a passport? Not until far into this course of exchanges. So Stokowski decided there wasn't any reason to open a case on Charles. She dropped it but handed her dossier over to Villaneta when she rotated. Villaneta then, Charles reinitiates the exchange, but not by saying, tell me about that Mexico thing again. He just says, howdy. This is a friendly exchange between two people that they've been carrying on. He just carries that on. Villaneta then reinserts this Mexico idea in the first set of exchanges that they have here in February of 2008, and Charles doesn't respond. There's sort of a lure with no response. Villaneta reinserts it. Eventually, by prompting him and goading him and sending a photo, apparently of a young child, saying that this is somebody who Stokowski had a great time with, eventually they get Charles to express more interest and respond, and eventually he's asking about logistics and things like that. That, I believe, is a few months down the road into this set of exchanges. But there are a lot of methods of inducement that continue to be used throughout that entire 13 months. And, in fact, throughout this entire course of exchanges taking over a year, Charles continues to express his reluctance in many ways. In the 12th month, after a year of this has been going on, and still Stokowski is saying, are you really going to do this? Are you really going to do this? Why are you making me wait? Is this going to happen or not? It's still obviously up in the air. After a year of it, Charles is still saying things like, I don't know. I feel apprehensive. This is a big step for me. And for the fifth time in the 12th month, he says, I'm just paranoid. I tend to be paranoid. I've learned to be paranoid. So that reluctance is continuing throughout this entire period, and that's why all of that inducing conduct is necessary throughout that entire period before Charles gets to the point where he actually finally undertakes this offense and commits that offense. So I believe that the inducement, meeting that standard, bearing in mind that the burden was on the government, and the question is could a reasonable jury have found that the government met its burden to show that it did not induce him. No reasonable jury could say with all of that in the record, comparing this to cases like Pullman, to cases like Jacobson, where there was entrapment as a matter of law. No reasonable jury, the Supreme Court in Jacobson, this court in Pullman said, even on the level of inducement in those cases, could have found that the government met its burden to show a lack of inducement. Well, in Jacobson it was conceded. The government didn't even try to say it wasn't. Perhaps I can use that as a device to ask you to focus on the other element, the predisposition. Okay. Now the issue of predisposition, the first thing to note about that, given how extensively, how much inducement was necessary to get Charles to commit this crime, 13 months of hectoring and pressuring, in Pullman this court said that if the government must work hard to induce a defendant, to commit the offense, it is far less likely that he was predisposed. That's the first point to note, after looking at all that inducement. It's very unlikely Charles was predisposed when it takes 13 months of constant expressions of reluctance and hemming and hawing and diversions and dropping the issue to get him to do it. Wasn't the idea of a sex tour of Mexico raised early on? Yes. It was raised in February of 08, initially by Stokowski, and his response was so diffident she didn't even open a case. Then it was re-raised later in February when Villaneta took over, still with no response, but then there was the cycle of luring and offering and sort of titillating him with pictures and pitching the trip and what a great time Kowski had and et cetera. And that continues throughout that entire 13 months, all here in Exhibit 2. But the key point, another point to make about predisposition is, you're looking at the question, the pertinent question is whether Charles was predisposed to commit the offense charged, the crime charged. And as the district judge pointed out, there was a jury question in the deliberations. Do we have to find he was predisposed to have sex with minors or to travel interstate and attempt to travel internationally to have sex with minors? And the judge gave the correct answer, which is you have to find he was predisposed to travel interstate and attempt to travel internationally for the purpose of having sex with minors because traveling is the actus reus of this offense. That is supported by Jacobson. The court makes the point, responding to the dissent, responding to the government's arguments, that even if it were shown that Mr. Jacobson were predisposed or had an interest in viewing underage pornography, in other words, the sort of core of the offense, the thing that draws someone to the offense, even if that predisposition is shown, that hardly shows that the defendant is predisposed to commit the offense charged of receiving underage pornography through the mail. Now, when that instruction, when that question came up from the jury, the government's position was, well, the traveling is just sort of a jurisdictional thing. We can ignore that. That's not correct. The Jacobson case makes it very clear. The Supreme Court's discussion makes it clear. That is an element of the offense. That has to be what the person was predisposed to do. Was Charles predisposed to travel interstate and attempt to travel to another country for the purpose of engaging in these acts? Well, the record in this case absolutely refutes that notion in many ways. You gave a reference that I didn't jot down, and I had missed that in Jacobson. Could you tell us again what it is you're referring to? Yes. The Jacobson case, it's on page carryover 551 to 552. So it's at the end of page 551. Petitioner's responses to the many communications prior to the ultimate criminal act were at most indicative of certain personal inclinations, including a predisposition to view photographs of preteen sex. And there's discussion of other things that came up in the course of that. Even so, petitioner's responses hardly support an inference that he would commit the crime of receiving child pornography through the mails. Now, to parallel the arguments that were made in this case, the government could say, oh, well, using the U.S. mail to get kiddie porn is just a jurisdictional element. We can ignore that. Well, that's not how the Supreme Court is discussing it in Jacobson. They're making a very firm distinction. The predisposition has to be to commit every element of the offense. And that is an essential element, and the consideration of that element is important here because Charles is a guy who said in his messaging with Mr. so-called Kowski he'd never traveled anywhere without his family. In the thousands, something like 3,000 chats supposedly made by Charles that the travel agent testified to, assuming that's Charles, she acknowledged in cross-examination there was not a single chat she saw by him that said anything about international sex tourism or trips to Mexico for engaging in sex with minors. There is no evidence that Charles so-called, to use the words of the Supreme Court in Sorrels, was guilty of this offense in thought or in deed. There is no evidence that he had been fantasized about doing something like this. He made comments, and we can talk about the comments he made that suggested there may have been sexual acts at some point, but he didn't make any comments, didn't express any fantasies, had never expressed any desire before this course of exchanges with the government that had to do with an act similar to this offense charged. And I will reserve the balance of my time. Thank you. You will hear from the government. Good morning. May it please the Court. My name is Bridget Beattie, and I'm appearing on behalf of the United States. The defendant traveled from Florida to Arizona and attempted to enter Mexico to have sex with young children. His entrapment defense failed because the government did not induce him to commit this crime, and the evidence of his predisposition is overwhelming. I'd like first to address— is there that he wanted to travel interstate to have sex with minors, and by predisposition I use the Supreme Court's definition of a disposition prior to contact with the government. Yes, Your Honor. In the chats with the undercover agents, which defense counsel has alluded to, in which, of course, the jury had the entire context to read and draw inferences, he said in three different chats that he had thought about traveling to have sex with minors. The first time was on March 10th, the first substantive communication that we have recorded in the chats. The agent asked him if he'd be interested in a hookup to go to Mexico to have sex with children, and he said, well, I'd be lying if I said I hadn't thought about it. As their communications continued, by February 11th, 2009, after he had committed and said, I want to make arrangements to make the trip, he made the comment to the agent, yeah, I'd never even thought about doing something like this much before we started chatting. The agent asked him, hadn't you thought about doing something like this going to another country? And the defendant responded, well, I'd read stories on websites about such things, and it did intrigue me. So there are at least three instances where he discusses his interest in essentially a sex tour. There's also evidence in these chats— So being intrigued and being predisposed, are those the same thing? Yes. This shows his state of mind, his fantasy life, his thoughts, his interest. As this Court stated in Pullman, what we're looking for when we're looking for evidence of predisposition was evidence that the defendant was interested in sex with children or even the view that sex with children should be legal. This record is replete with those sorts of statements. There are at least nine different chats in which he— Is that enough? I mean, that gets to the question we were discussing with Mr. Kaplan. What does the predisposition have to be dispositioned to do? Is it simply sex with children, or is it traveling for that purpose? The predisposition for the criminal conduct is to have sex with children. The element of travel is, as Mr. Kaplan alluded to, a jurisdictional element. There is a case from the First Circuit, Gamache, which is the only case I've identified that discovers this, in which the Court addressed this particular statute and noted that that portion is a jurisdictional element and also provides the overt act because this is an intent crime. But assuming the government does need to show he was predisposed to travel, in the chats he talks about prior trips, including a trip to San Diego where he made salacious comments about how he had the opportunity to shower with his four-year-old— his cousin's four-year-old child, but missed that opportunity. He also makes a comment to the agent that he would like to combine a trip to Mexico where he could sexually abuse children with another trip to San Diego to visit his cousin and presumably see her young children again. So assuming as a matter of law that we have to show he was predisposed to travel to have sex with children, the evidence shows that that occurred. The other evidence of his predisposition is overwhelming. Throughout the chats, in his own words, he describes in graphic detail his past sexual acts with children. He repeatedly states that he's a pedophile, that he believes pedophilia is natural, for men and boys to bond together sexually, that it is just misunderstood by society. It's part of society's hatred. He makes those comments from the very first substantive chat we have printed on March 10th, 2008, and he mirrors them back again at the end of the communications in February. He makes a statement in his first chat with the agent, it's not like this isn't something that's been happening for about 10,000 years already. They might have something—they might have reason to beef, but seriously, captains have their cabin boy, knights have their squires, priests have their altar boys. The signs are just there if you look. But society is too good at being told what to believe. By the next February, he says the same thing, February 26th. It's a natural thing for men and boys to bond together, including shared sexual experiences. Every knight has his squire, captains have their cabin boys, and priests have their altar boys. It's altar history if you look. He keeps saying, I haven't had sex for five years. Does that mean that all the rest of this is just fantasy? No, Your Honor. He does say that he hasn't had sex in five years. He's said it more than once. He does say it a couple of times, but he also says in, I believe it's nine different chats, he describes his experiences with oral and anal sex with young boys. And he then later, his counsel argues that that is all fantasy. The first point is that's irrelevant because it goes to his state of mind. It's what was described as predisposition in Pullman. Well, I don't know. The Supreme Court in Jacobson seemed to be making at times a difference between the predisposition to commit the crime and just the fantasy life. I think they truly made that distinction. Well, Your Honor, in Jacobson, the significance in Jacobson was there's two parts of the evidence of predisposition. One was that the defendant had ordered magazines before it was criminal. The Child Protection Act of 1984 was passed in the interim, and the court said he did something that was legal at the time. That doesn't necessarily mean he would do it after it became illegal. Even though he probably has the same fantasies before and after the law is passed. Well, what the evidence showed of his interest in sex with children was directly in response to the government's solicitations. The government contacted him in multiple ways and posed as five different lobbying organizations and sent him sexual surveys and questionnaires and elicited from him statements showing his support for fighting censorship and repression of individual rights. And he made statements there indicating an interest in photographs of some sexually explicit material. But the court found that that was tainted, because if the statements of predisposition that come during the investigation are elicited by the government, they wouldn't look to that. This is entirely different. All of the things he talks about and says repeatedly over and over through the chats are instances in which he claims he molested children long before this investigation started. His longstanding views of pedophilia is natural and misunderstood. He says many times that children initiate sex, showing his view that this is something that children enjoy and are participating in is consensual. That's very different from Pullman, where the key there, and now Justice Breyer, then Judge Breyer explained that what was significant about Jacobson was that the government appealed to an alternative, non-criminal motive. There are his political views. That did not happen here. I have a couple of questions that relate to jurisdiction and procedure and that sort of thing. First of all, why are these ICE agents? Why is ICE conducting the investigation? How did they get involved? I don't know the answer to that. This is not their normal bailiwick, is it? Well, what I know is that this child exploitation unit was up and running in Yuma since 1997. I don't know the origins of the unit or why it was decided within an agency that it would be housed in Yuma, presumably because of its proximity to the border or how it became an ICE function. Okay. Next question is why use the, is it wiki-sposure, the volunteer, the woman who apparently devotes her spare time to exposing pedophiles? Why was that testimony necessary? Well, Your Honor, in retrospect, we can say the testimony was not necessary after conviction, but going into a case, the government has a right to present probative evidence. The testimony she provided was probative. She was a volunteer for an organization that attempted to identify pedophiles, and she had read thousands of posts under a user named Chaos and Chuck, and she testified at trial about what she observed in those posts. And under this Court's decision in Tank, the things that she observed when she read the post, which any person can do, were sufficient for the jury to consider that evidence and give it what weight it was due and decide if there was sufficient information in those posts to link the user named Chaos or Chuck who made those statements to the defendant in this case. It's important to remember that he used the same usernames when communicating with the agents. He said in those posts he was from Florida. He told the agents that. He said his age of attraction was 5 to 40. Same thing to the agents. He could have done that with an agent, though, right? Well, if the agent had been the one who personally... And if the purpose of the testimony is to show which name in which chat room is associated with whose email, then that could have been done through an agent, right? Well, it could have been done through an agent if an agent had been the one who had read the post online and had printed the screenshots and could authenticate them. That is what Ms. Weller could do. She provided the authenticity that she had printed them off from the Internet. The purpose was to allow the jury to draw a link between the things that were said in these posts and all of these posts which were introduced, and there were four exhibits. So you have an investigative agency whose normal jurisdiction is customs and border-related stuff, doing undercover investigations of pedophilia. You use as a witness a woman who could be described as a vigilante? I don't think there's any evidence to suggest she's a vigilante. What was her official authority for doing what she was doing? I don't believe she had an official position, Your Honor. She was a citizen who read things on pedophile websites and printed them off. And the significance of that evidence is that these are all things he said, before the investigation, and the jury could draw the link. And it took 13 months to convince this man to travel to Yuma? The investigation lasted 13 months. An important point of that, Your Honor, is that there were 57 chats over the 13-month period. The defendant initiated 29 and the government 28. In the first two months of the investigation, there were eight chats. The defendant initiated all of them. In the first six months, there were 17 chats, all the way through August. And the defendant initiated 14 of them, the government three. The defendant was repeatedly approaching the government, initiating chats. There would be gaps for, say, a month or five weeks at a time, and the defendant would come back and again initiate chats. He raised the subject of going to Mexico to have sex with children in 16 different chats. He raised the topic. He was not hounded. He was not pursued. He was a very willing and eager participant in these communications. And when you look at the gaps, and there were at least six of them that go on from two weeks to five weeks, he didn't ever say, I'm not interested. Please stop contacting me. This is revolting. I don't want to go. To the contrary, he said things like, on September 17th, it's just amazing to think I have this opportunity. I've been on the net for 13 years. Opportunities like this don't come along every day. Each time the agent would say, I've been in Mexico, or would you like me to? Doesn't that suggest that but for the inducement, the crime never would have happened? That is the case in every undercover operation, Your Honor. But for this particular opportunity, this particular crime would not happen. Presumably undercover operations are designed to pick somebody up who's going to do it someplace else. Otherwise, there's no justification for getting someone to commit a crime that wouldn't be committed. Yes, Your Honor. The point is to intercept a child predator before a child is sexually abused. And in this case, the defendant was on pedophile websites by his own words for 13 years. What he described as his boy lover home. He made repeated comments about his interest in sex with children throughout his communications with the agents. He was a person who met the agents online, engaged in a lengthy communication with them, continued to initiate communications and reach out to the agents. He was not being pursued. Early on in the chats, it was April 24th, he started asking logistical questions about how he would go about this trip. And when the agent began to describe some of the more lurid details such as the rules, no biting or bruising, no PDA, don't do anything that leaves a mark on your young companion, he responded, that's just sensible stuff. This is a man who was clearly interested in having sex with children, who had expressed his interest in traveling to do that. Can I go back for a minute to your lay witness? Can that witness, is it a lay opinion that these were his chats? In other words, she says, okay, these communications were from Soderman. How does she know? I mean, what I'm really asking you, is this an expert opinion? No, Your Honor, it's not an expert opinion. What Ms. Weller testified is that she observed information in chats. From the information she saw, she ran searches on Internet search engines, such as Google and Intellius. Those are publicly available search engines. She typed in information she observed in the chats, and from that she found his name. Now, the defense argues that that was expert testimony clothed as lay opinion. The district court found that it was not, and that we would review that for an abuse of discretion. But assuming that it was, she also testified at length about what she observed in the chats, and in the exhibits that were introduced, from the face of the chats, the jury could see that same information, and there were multiple identifying things in the chats that would link those comments to the defendant. And that is in no way could be argued to be expert testimony. What's involved in it is reading. Defense argues that the government was required to have somebody look up the IP address and track the physical location of the computer from which these chats originated. That is not what this Court has said is necessary. In the United States v. Tank, this Court said very clearly, when there's sufficient information on the face of the chat, and those were Internet printouts of chats as well, the jury can give it what weight it's due and consider whether there's a link between the defendant and the chats. Did the jury know that Soderman was gay? I believe that they did, because throughout the chats he talked about, he described himself as both a boy lover and as a gay boy lover. And is that relevant to this offense? No, he was not charged with being gay. He was charged with traveling through interstate commerce and attempting to travel in foreign commerce with the intent of engaging in illicit sexual conduct with a minor. The fact of sexual preference came up in Vore Dyer, didn't it? The defense asked for a questionnaire and wanted to submit approximately 15 questions to the jurors asking about their views on homosexuality, some of which dealt with homosexuality. I'm at three seconds. May I continue? Sure. Thank you, Your Honor. The district court judge refused to ask many of those questions, but what he did ask was, are there any of you who, considering the nature of these charges, having sex with children, would not be able to be fair and impartial? And that was what was at issue. And that Vore Dyer identified a juror who said, I don't think I could listen to that evidence and be fair and impartial. During Vore Dyer, was the jury asked whether any of them thought that a gay person would be more likely to engage in this behavior than someone who was straight? The district court judge refused to ask that question, and under this Court's decision in Click, that was appropriate. In that case, the gay defendant asked for a series of questions to draw out information about the potential jurors' views on homosexuality, and the Court declined to do so, and this Court said that was appropriate. But the crime there was very different. What was the crime involved in Click? It was a bank robbery. So the crime here was a sexual offense. But the questions that the defense requested, as the district court correctly found, also tried to plant the seeds of their theory. What if the person had never acted on it? Well, that's one of their theories, that it's fantasy, although we don't know that, and it doesn't matter anyway. But the district court conducted a thorough Vore Dyer, which is in the record, asked the jurors the appropriate questions to find out if there were any who could not be fair and unbiased. And as the Seventh Circuit said in Gacy, which was a notorious serial murderer who was also homosexual, the defendant's protection does not lie in those questions. It lies in the size of the jury and the thoroughness of the Vore Dyer on a whole, and that's what the defendant had here, and he had the appropriate questions asked. I believe I've misread the clock because now it says a minute 56. It said seven seconds before, so I'm not sure where I stand with that. You're with the government. You believe in deficit spending. You're now in deficit time. Well, I hope so, so we don't close down on Friday. I will just close by reminding the court that the jury had the entire transcript of the chat. They draw all their inferences, looking at it in the light most favorable to the government, whether they could find in our favor on either prong. And in this case, this man was not induced to commit this crime, and he was clearly predisposed to do so. And we ask that you affirm his conviction. Thank you. Was that my time going away over there? Is that what I've got here? Okay. Let's look at these comments about having thought about it. Okay. He said, you know, it's interesting, he says, towards the end of this 13 months of chatting. It's interesting. I never even thought about it, and then he puts brackets, much, much in brackets. Apparently, there was some slight thinking about it. Now, I suppose you could say he was guilty of it in thought if he thought about it as a passing thought that he had. But in Jacobson, the Supreme Court said that a person's thoughts and fantasies are their own and beyond the reach of government, and for that reason could not be considered evidence of predisposition. Mr. Jacobson, by the way, had a lot more thoughts about it, and he even went over the border into conduct about it, because Jacobson ordered child pornography just before they made it illegal. He actually did the act. The government is hanging its hat here on some fleeting thoughts that Charles had, and Charles stressed that it was Kowski who, quote, got him interested, who got him into it. And Kowski himself, the government itself at one point says, well, I got you all interested, didn't I? I got you all interested, huh? Something to that effect. It's all in the chats in Exhibit 2. The thing about going to visit his cousin and having sex, what he said was, I couldn't do anything with those kids. I would feel bad about that. I wouldn't do that. It's remarkable that they're going to point to that as evidence of predisposition now. Past sexual acts, actual molestation, assuming it matters, despite what we've said about the element, the actus reus here not being part of that. The fact is the evidence was absolutely overwhelming. No reasonable jury could base a finding that he committed sexual molestation on a few messages he made to an agent. He also has an alternate life on the Internet, by the way, as a troll. It was a place for fantasy and sublimation, and every single ascertainable person who he supposedly was describing having sex with when they were underage came to the court, testified under oath, nothing ever happened. That was utter fantasy on his part. And their parents came, and they testified nothing ever happened. These were people who lived in close quarters with Charles, and the evidence is overwhelming. If the government went to court and said we want to prosecute this man for committing these sexual acts with children based on his messages that he sent to an agent, they would be thrown out of court in the blink of an eye, and rightly so. There are no reasonable jury could have based a finding that Charles committed molestation based on nothing more than a few chats that were utterly overwhelmed. And by the way, the district judge at sentencing said, I find Charles never acted on his inclinations ever before the government started this course of chats with him. I find he is not a danger, and that went into the sentencing determination. He saw all the evidence firsthand. If there are no questions, thank you. Thank you. We thank both counsel for the argument. The case just argued is submitted.
judges: Canby, Hawkins, Clifton